𝔚𝔥𝔢𝔢𝔩𝔦𝔫𝔤.

COLE v. MOXLEY.

(Absent, HAYMOND, JUDGE).

Decided April 27, 1878.

1878.
Special Term.

F. has a contract to carry the U. S. mail, and the contract expired on the 1st day of July, 1871. About the 1st of January, 1869, M. bought of F. the said contract, for $350.00, and then sold a half interest therein to C., and M. and C. paid each one-half of the purchase money to F., and agreed between themselves, that they would together carry said mail and share equally in the profits and losses. On the 16th of May, 1870, M. refused to allow C. to have anything further to do with the business, although C. was ready, willing, and offered to do his part; and M. then claimed to have dissolved the arrangement between them, claiming that if it was a partnership it was at will, and he could dissolve it at pleasure, and himself carry the mail until the close of the contract. HELD:

I. That there was a partnership between the parties.

II. That from the acts and conduct of the parties and other surrounding circumstances, the partnership was to continue for a fixed period, to-wit: until the expiration of the contract which was the sole subject of the partnership.

III. That it was not in the power of M. sua sponte, to dissolve the partnership as he claims he did, and that therefore it continued, until it expired by limitation, and M. must account to C. for one-half the profits accruing therefrom.

Appeal from, and supersedeas to a decree of the circuit court of Lewis county, rendered on the 26th day of

July, 1875, in a cause in chancery in which James P. Cole was plaintiff, and Wm. Moxley was defendant, granted on the petition of James P. Cole.

Hon. C. S. Lewis, late judge of the second judicial circuit, presided at the hearing below.

JOHNSON, JUDGE, furnishes the following statement of the case:

At rules held in the clerk's office of the circuit court of Lewis county, in December, 1871, Jas. P. Cole filed his bill in chancery against William Moxley, which was substantially as follows: that one W. P. Francis had become a mail contractor for carrying the mail on route No. 4192, from Weston, in the county of Lewis, to Nicholas Court House, for four years, terminating July 1, 1871, at the price of $990.00 per annum. The said contract was for a weekly service, going to and returning from Nicholas Court House. About the 1st of January, 1869, the said Francis sold the benefit of his contract for carrying said mail, with all its profits and obligations, to the plaintiff and the defendant, who were to perform all the service required of the said Francis. In consideration of the advantages of said contract, the plaintiff and defendant jointly paid to the said Francis the sum of $300.00 in money, and a horse of the value of $50.00; and thereupon the said plaintiff and defendant were to be jointly entitled to all the pay and allowances for carrying said mail, to be drawn from the United States government for said services. The said plaintiff and defendant employed mail carriers, and furnished horses on which to carry the said mail from the time of the said contract with said Francis, until about the 15th of May, 1870, when the said defendant took entire control of said contract, refusing to allow the plaintiff to participate in the services or profits of said partnership; but the plaintiff protested against such refusal, and averred his readi-

ness to fulfill and perform any and all acts necessary or proper to be done under said contract of partnership. But the defendant refused to allow the plaintiff to participate therein, and assumed the sole control of said contract, and received all the money arising therefrom. On the 1st day of February, 1870, the contract was changed by the Postoffice Department of the United States, and the services were increased to two trips per week, on that part of the route between Weston and Braxton Court House; and the pay was increased by $545.77 per annum. This additional service was performed under the partnership aforesaid, which the plaintiff avers was performed and consummated at the time plaintiff and defendant entered into the contract for carrying said mails; and the consideration having been jointly paid, the partnership could not be dissolved without the consent of the contracting parties; and therefore continued in force until July 1, 1871. The plaintiff prayed that as the partnership had terminated by limitation, the partnership accounts between them be settled before a commissioner of the court; and prayed for general relief. The defendant not answering, the court on the 6th day of March, 1872, referred the cause to one of the master commissioners of the court, who was directed "to examine, state and settle the partnership of the said plaintiff and defendant, and make report thereof to the court, with any matters specially stated deemed pertinent by himself, or which may be required by either of the parties to be so stated; and if deemed necessary by the commissioner, leave is hereby given him to examine the parties on their oaths, upon proper interrogatories, filed by either of the parties, or upon such interrogatories as he may propound, if any be deemed necessary by him."

The defendant appeared before the commissioner, and examined and cross-examined witnesses, and at the very last moment when the cause was submitted, more than three and one-half years after the bill was filed, he filed

1878.
Special Term.

Cole
v
Moxley.

his answer, to which the complainant replied generally.

The answer is as follows :

" For answer the defendant says, he denies the allegation of the bill, that said Cole and this defendant purchased jointly, from W. P. Francis, the contract for carrying the mail on the route from Weston to Nicholas Court House. About the 1st of March, 1869, this defendant alone, on his own responsibility, and not in connection with Cole, purchased from Francis the benefit of said contract for the remainder of the contract ·period expiring on the 1st of July, 1871. This defendant incurred the obligations and perils · of said purchase by giving bond in a large penalty, with security furnished by him to said Francis, for the faithful performance of the contract, in which bond said Cole was no party.

"At this time said Cole and this defendant, were together owners of a lot of horses and ·vehicles engaged in partnership livery business. After such purchase this defendant proposed to Cole to help carry the mail while they should be engaged together in the livery business, if he would pay this defendant half of what he agreed to pay Francis for said contract, and pay half the expenses, and undergo half the obligations throughout. With this understanding they did carry the mail with their livery horses together until 14th May, 1870. About 1st May, 1870, said Cole himself proposed to this defendant that they should discontinue their livery partnership by one or the other selling his share in the stock to the other, or dividing the same, and cease to do business together. The result of their conferences was that about 1st of May, 1870, they divided their horses, vehicles and other livery stock, each taking his share, and Cole took his from the stable of the *plaintiff*, where the business had been carried on, to another stable of his own, and engaged in the livery business alone. Thus ended their whole connection. If these facts constituted them in law partners in the mail service, then they were partners ; but this defendant being

the sub-contractor, regarded said Cole rather in the light of his agent in the performance of the mail service, in so far as he acted therein. This partnership, if it was such, had at no time any definite, fixed period of duration, but as the defendant contends was only at will, and dissolvable at the pleasure of either party, and at most it could not continue beyond the continuance of said joint livery business. Moreover said Cole acted improperly towards the defendant in said matter, in taking and seeking to take into his custody receipts for money paid for expenses incurred in carrying the mail, and other papers relative thereto, and not submitting, but excluding them from the inspection of this defendant.

"After said Cole and this defendant had dissolved their partnership in the livery business, and divided their stock as above stated, said Cole, without any just authority, attempted to take sole control and management of said mail service, and to exclude and prevent this defendant carrying on or having anything to do with it. And with this object, about 15th of May, 1870, notified the postmaster at Weston that he, Cole, would in future carry the mail, and that he, the postmaster, must not deliver the same to this defendant. Under these circumstances, and deeming their connection dissolved, this defendant, under the decision of said postmaster that he was entitled as sub-contractor to receive the mail, did carry the mail from Monday, May 16, 1870, until the expiration of the contract on 1st July, 1871, at his own expense, without any aid or assistance from Cole. The profits in said business throughout were little or nothing. This defendant agreed to pay said Francis for said contract $350.00. He paid $50.00 of it in a horse belonging to him and said Cole jointly ; the residue was paid by this defendant. It is true Cole paid $150.00 in discharge of a note in bank given by defendant to raise money to pay Francis, but the money so paid by Cole was derived from the Postoffice Depart-

ment for carrying the mail, half of which belonged to the defendant, so that Cole never paid but $100.00 of what the defendant agreed to pay Francis. Under the terms of the contract with Francis though the defendant was to carry from the 1st of March, 1869, his pay was not to commence until 1st April. For the first quarter this defendant received pay and settled it with Cole ; for the two next quarters, Cole received pay and made a settlement thereof with this defendant, but for the next quarter Cole drew the pay, amounting to at least $315.00, which he retained, converted to his own use, never settled with this defendant for it, and this defendant never received any part thereof. And so the defendant charges that said Cole is in fact indebted to him a balance on account of said mail business, and if this court should deem the relation between the said Cole and this defendant in said business a partnership and entertain jurisdiction of this cause, to which jurisdiction the defendant excepts, he prays that in such case a decree be entered against said Cole in favor of this defendant for such balance."

The defendant's deposition before the commissioner is as follows :

"Answer to 1st interrogatory.—For answer, the defendant says that about the 1st of January, 1869, as well as he remembers, he purchased from William P. Francis the contract for carrying the mail on said route until the 1st of July, 1871. This purchase was by the defendant solely, and in his own name, and said Cole was unknown in the purchase. After such purchase, the defendant proposed to Cole to help carry said mail while they were in partnership in the livery business, (which livery partnership then existed) provided said Cole would pay half of the price which Moxley agreed to pay Francis, and undergo half the expense and obligations throughout. Cole agreed to this, and they did together carry the mail until about the 15th of May, 1870. This defendant paid Francis $350.00 for said contract, of

which $50.00 were paid in a horse belonging jointly to the plaintiff and defendant, and I paid $300.00, and the plaintiff paid $150.00 in bank on a note given by the defendant to the bank for the purpose of raising money to pay Francis for the mail contract. But this $150.00 so paid by Cole, was money drawn by him from the Postoffice Department as compensation for carrying the mail on said route, half of it belonging to the defendant and the other half to the plaintiff. So the defendant claims that the plaintiff never paid but $100.00 on said purchase from Francis. The plaintiff and defendant carried the mail together from the 1st of January, 1869, to the 14th May, 1870—the defendant carrying the mail for the rest of the contract terminating on 1st of July, 1871, alone at his own expense, and without any aid or assistance from Cole, the plaintiff. The contract price for carrying the mail was $990.00 per annum, but the service having been increased, the compensation was also increased by the addition of about $530.00 per annum. About the 1st of April, 1870, during the time the plaintiff and defendant carried the mail together, small deductions were made from this compensation by the Postoffice Department for failure of trips. The amount of such deductions the defendant cannot give. Under the contract with Francis, the mail was to be carried for a certain time, about one month and a half the defendant thinks, and said Francis was to receive the compensation for that time, and for this time the plaintiff and defendant received no compensation. For a time Francis, the contractor, drew the compensation for carrying the mail, paid it to me, and I settled and paid to the plaintiff his part; then Francis empowered A. C. Holt and the plaintiff to draw the money. They accordingly drew pay for carrying the mail under said power from Francis, and the money went into the hands of the plaintiff as the defendant understands. The plaintiff settled and divided with the defendant the pay for two quarters, but for the last quarter of their

joint service, the said plaintiff drew the money — some from the postoffice — amount not known to the defendant, and through the bank the sum of $305.00, and some cents, for which said plaintiff has never accounted or settled with the defendant. The defendant cannot state the expenses incident to the said service, as they were incurred at many points and in many ways along the route and no regular books or accounts thereof were kept."

This is all the defendant says upon the subject of partnership.

The plaintiff's deposition on the same subject is as follows:

"About the 1st of March, 1869, Mr. Francis proposed selling the carrying of the mail from Weston to Nicholas Court House, to different persons. Moxley and myself had been talking about buying it, and about that time Moxley told me that he had bought such carrying of the mail from said Francis for $300.00, and a horse belonging to the livery stable kept by said Moxley and myself in partnership, which horse was a partnership horse. He told me that he was to give Francis the horse and $50.00 that evening, and called on me for one-half of the money, to-wit: $25.00, $10.00 of which I paid at that time, and paid him $15.00 more a day or two afterwards; of the balance of the money paid to said Francis for said letting of the mail, $150.00 was raised by a loan from the bank on a note of H. G. Ford, endorsed by William Moxley, the defendant, A. Williams, and myself, and the remaining $100.00 was paid by a note which Francis owed said Ford, or Ford & Butcher, I do not remember which. When the note in bank became due, I borrowed the money from A. C. Hale and paid the note. Dennison had been a subcontractor under Francis, and after we purchased Francis out, we carried the mail for the two last weeks in March for Dennison without compensation, as part of the original consideration. Our pay did not commence until the 1st of April, 1869, and from that time until

the 15th of May, 1870, we carried the mail in partnership between said places. On Monday, the 16th of May, 1870, I believe, it being my week to carry the mail, I called at the postoffice for it, when the postmaster told me that both Moxley and Francis had notified him not to give me the mail any more and refused to give it to me. I was then, and at any and all times thereafter, ready and willing to perform the full measure in the undertaking between us as partners. The mail was continued to be carried under the superintendance and control of the said Moxley until the 1st of July, 1871. Our partnership being coupled with an interest on my part I was unwilling to dissolve it, for by reason of the increased compensation, the profits were considerably greater, for by a letter by the Postoffice Department, dated January 27, 1870, the service was increased to two trips per week between Weston and Braxton Court House, for which there was allowed $545.77 additional pay per annum, which was to take effect on the 1st day of February, 1870. The compensation for the first quarter, from April to July, 1869, was drawn by me and devoted to the payment of the expenses on the route in part, and the note in bank referred to heretofore, and what was not so used was divided between us. The October and January installments were collected by me, and after paying the expenses of carrying the mail, the residue was divided between myself and the said Moxley. The April installment of 1870, the check amounting to $305.32, was drawn on June 4th, 1870. I offered the said Moxley half of this check as soon as I drew it, but he refused to take it. I then paid out of this amount the majority of all the bills against us on the route from January, 1870, to the 10th of June, 1870. For the quarter ending July 1st, 1870, I collected on duplicate receipts from postmasters on the route, $10.00 or $11.00, the exact amount I cannot remember. Mr. Moxley and myself adjusted our accounts up to the 1st of January, 1870, and from that time the accounts remain unsettled.

CROSS-EXAMINED.

1st interrogatory, by the defendant.—Do you not remember that on the day Moxley purchased the contract from Francis, that Moxley stated to you that he had bought the mail route, and had to pay Francis $50.00 down, and had only $40.00, and asked from you the loan of $10.00, and that you gave him the $10.00, and he asked you to go down to the bar-room to witness the contract, and that you did so?

Answer to 1st interrogatory.—He, Moxley, came to me and told me that he had purchased the contract from Francis, and that he was to give him $50.00, and the livery horse before mentioned, and called on me for $25.00. I gave him $10.00, as I had no more at the time, and a day or two days afterwards, I gave him the remaining $15.00.

2d interrogatory, by defendant.—Did you ever see the note you speak of as being from Francis to Ford, or Ford & Butcher?

Answer to 2d interrogatory.—I think I saw it, but I would not be positive.

3d interrogatory, by defendant.—Do you not know that Francis was indebted to Butcher & Ford for rent, and in the sum of $105.00, and that Moxley, as part payment to Francis for the mail contract, gave his individual note to Ford & Butcher for said debt?

Answer to 3d interrogatory.—I understood that Francis was indebted to them for rent, and that they transferred that debt to Moxley, who made use of it as part pay on the purchase of the contract from Francis.

4th interrogatory, by defendant.—Did you ever pay any part of the consideration for which Ford & Butcher transferred to Moxley their debt on Francis?

Answer to 4th interrogatory.—I never paid any of the principal, but I paid interest on $50.00 for one hundred and twenty days in bank, and interest on $75.00 for sixty days in bank.

5th interrogatory, by defendant.—Did Moxley give Francis a bond for the faithful performance of the contract for carrying the mail, and did you join in the same or not?

Answer to 5th interrogatory.—He never asked me to join him in such a bond, and I never did; I suppose he gave it.

Cole, the plaintiff, being again examined, he was questioned by the defendant, and was also examined for himself as follows:

Question by defendant.—Had not you and Moxley, by an arrangement between you, been carrying the mail alternate weeks? And was not the week commencing on said 16th of May, 1870, Moxley's week for carrying the mail?

Answer.—Yes; it was.

Question by defendant.—Do you remember that after we dissolved partnership in the livery business, I remarked to you that neither of us had horses enough alone to carry the mail, and that I offered to let you carry the mail with me week about?

Answer.—We divided the livery stock about one month after we first began to carry the mail; had three or four horses each after the division, and we furnished a horse, week about to carry said mail. Don't remember that Moxley ever made any remark to me that neither of us had horses enough alone to carry the mail. Either one of us had horses sufficient for the purpose.

Question by defendant.—Did you not, on the day you have spoken of meeting Moxley at the postoffice, have a horse and carrier at said office in Weston, and did you not demand the mail of the postmaster, to be carried with the horse and carrier you so had at the postoffice? And did you not object to Moxley or his carrier having the mail that day?

Answer.—Yes; the carrier and my horse were at said postoffice on that day by my order. I claimed that the mail should be delivered to the carrier who was then

there with my horse at the postoffice. I did object to the carrier Moxley had there having the mail, because the carrier I had there had been sent for, and had been here three or four days.

Question by defendant.—On the morning of the day you and Moxley met at the postoffice, each claiming possession of the mail, did not Barnes, the postmaster, decline to deliver it to either of you, as you were both contesting the right to the possession of it, until one or the other of us should show that he was entitled to it by lawful right? And did not A. A. Lewis and Jesse Woofter, who were my securities in the bond given by me as sub-contractor to W. P. Francis, contractor, appear and make it known to said postmaster that Moxley was subcontractor, and they his sureties, and thereupon the postmaster delivered the mail to me?

Answer.—The postmaster, Barnes, did not deliver the mail to Moxley until said Lewis and Woofter, his sureties, appeared and stated that they had gone on a bond with Moxley to Francis for carrying the mail, and thereupon said postmaster did deliver the mail to Moxley. The said postmaster, of course, did refuse to deliver said mail to either of us until Lewis and Woofter appeared and stated as aforesaid.

Question by complainant's counsel.—State whether there was anything in the terms of your partnership with Moxley at the time it was entered into, which forbid either partner from performing the entire duty appertaining to the service?

Answer.—There was not. Each party was to perform equal service, share equally in profits, or contribute equally to losses.

Question by complainant's counsel.—After the dissolution of the partnership in the livery stable, state whether you agreed with Moxley as to the manner of performing the mail service, and what that manner was.

Answer.—We did agree as to the manner of such service, and it was this: Each one of us was to furnish his own horse, and carry the mail week about.

Question by complainant's counsel.—After this agreement, in the event Moxley had failed to carry the mail any week, would you not have felt constrained in fulfilment of your original agreement to have performed that service yourself?

Answer—I would.

Question by complainant's counsel.—State whether under the terms of your partnership you were not authorized to employ mail carriers, and whether you did not so employ a mail carrier; and if so, when?

Answer.—It was understood between Moxley and myself that no one should carry the mail unless he was satisfactory to both parties. I employed a carrier from Jane Lew, which Moxley agreed to before he was sent for. It was in May, 1870.

Question by complainant's counsel.—What became of the party you employed from Jane Lew to carry said mail? And state whether upon Moxley's subsequent disapproval of him, the difficulty did not occur on the 16th May, 1870, heretofore spoken of by you?

Answer.—I paid him for the time he had been here, and he went back to Jane Lew on the following morning. The difficulty between Moxley and myself at the postoffice, on said 16th May, 1870, arose out of employing said party from Jane Lew, and Moxley's disapproval of him.

Question by complainant's counsel.—Take the two papers here following:

"WESTON, W. VA., May 13, 1870.

"Received of J. P. Cole $7.50 for carrying the mail
                                "P. B. LAMB.
"*May* 13, 1870."

"MR. JAMES COLE:

"Please settle your half with Peter Lamb. I have settled my half.
                                "WILLIAM MOXLEY."

And state whether they are genuine, and whether you paid the money mentioned in the receipt of Lamb.

Answer.—They are genuine, and I did pay the money mentioned in Lamb's receipt.

A. C. Hale testified, that Cole and Moxley dissolved partnership in the livery business, in May, 1869, as he thought.

W. S. Kennedy testified, that he was a mail rider for Cole & Moxley, and that the most of the time that he was employed for them, was before the increased service and pay, and a part of the time afterwards.

The evidence showed that there was a dispute between them about the 16th of May, 1870, and both tried to get sole possession of the whole business, and Moxley having given the bond, the postmaster delivered the mail to him.

Jesse Woofter testified, that he understood from both parties, that they were partners in carrying the mail.

The account was taken by master commissioner, G. J. Butcher, and he made two statements, one based on the theory, that the partnership was dissolved, on the 16th day of May, 1870, in which case he found, that upon a settlement, as of the 30th day of January, 1874, Cole, was indebted to Moxley, in the sum of $180.24. The other statement was based on the theory, that the partnership, was to extend to the end of the contract of Francis, to-wit, the 1st July, 1871, and that it was dissolved then by limitation, on settlement as of the 30th January, 1874, the defendant, William Moxley was indebted to the plaintiff, J. P. Cole in the sum of $133.11. The commissioner, made liberal allowance to Moxley for use of horses, &c. Moxley did not except to the report of the commissioner at all, but Cole did except to the statement only, based on the theory that the partnership was dissolved on the 16th day of May, 1870.

On the 26th day of July, 1875, the cause was heard " on the bill, answer of defendant, general replication thereto, report of commissioner G. J. Butcher, plain-

tiff's exception to said report, depositions, and former orders and procedings;" on consideration whereof the court overruled the plaintiff's exception to said report, and confirmed the report "except its statement finding the sum of $133.11 as due from defendant to plaintiff on the 30th day of January, 1874, and decreed that the plaintiff pay to the defendant the sum of $193.44, being the sum of $180.24, with interest on the principal, $147.82, from the 30th of January, 1874, to the date of the decree, but gave no costs; and leave was given to sue out execution on said decree.

From and to said decree an appeal and *supersedeas* was granted.

*Andrew Edmiston,* for appellant.

*Henry Brannon,* for appellee.

JOHNSON, Judge, delivered the opinion of the Court:

The following questions are presented in this cause: Was there a partnership between the plaintiff and defendant? If so was it for a fixed, or for an indefinite period? When was it dissolved? Is the decree of the circuit court right? Domat's definition of a partnership is, "a contract between two or more persons, by which they join in common either their whole substance or a part of it, or unite in carrying on some commerce or some work, or some other business, that they may share among them all the profit or loss, which they may have by the joint stock which they have put into partnership." It is usually defined to be "a voluntary contract between two or more competent persons, to place their money, effects, labor and skill, or some or all of them, in lawful commerce or business, with the understanding that there shall be a communion of profits thereof between them," and of course if there is loss they must share that. Story on Partnership, sec 2.

It appears by the pleadings and proof in this cause, that the defendant Moxley bought out the contract for

carrying the mail, between Weston and Nicholas Court House, about the first of January, 1869, of Wm. P. Francis; that the said Moxley and the plaintiff, Cole, jointly paid Francis therefor the sum of $350.00; that they entered into a partnership, to carry said mail and to equally share the profits or losses. That the contract of Francis was to expire on the 1st of July, 1871. That they did carry said mail under said partnership arrangement, until the 16th of May, 1870, when Moxley took possession of the business himself and refused to let Cole have anything further to do with it. That about the 1st of February, 1870, the Postoffice Department of the United States, changed in some respects the contract, requiring the mail to be carried twice a week, from Weston to Braxton Court House, on the route instead of once, and increased the compensation therefor more than $500.00 per annum. This may have been the reason why Moxley wanted to dissolve the partnership and draw all the profits himself. After this increase of pay, however, Cole & Moxley carried the mail together, as usual, until the 16th of May following. Moxley, in effect, admits a partnership in carrying the mail, but claims that it was only to continue as long as their partnership in the livery stable business continued, and says that was dissolved in May, 1870. His language is, " after such purchase, (from Francis) this defendant proposed to Cole, to help carry the mail while they should be engaged together in the livery business, if he would pay this defendant, half of what he agreed to pay said Francis for said contract and pay half the expenses, and undergo half the obligations throughout. With this understanding they did carry the mail with their livery horses together until the 14th of May, 1870." He says about the 1st of May, 1870, they divided their stock, vehicles, &c., and ended the whole connection. This claim of the defendant is not sustained by his own deposition even, and is expressly shown to be incorrect, by the testimony of the plaintiff, and A. C. Hale, who both

clearly show that the partnership in the livery business was dissolved in the spring of 1869, not long after the arrangement was made between them for carrying the mail. I think the proof shows a partnership clearly, and the commissioner reports from evidence before him that the parties had adjusted their accounts on the 1st day of January, 1870, and for that reason he deemed it unnecessary to make any statement for the time anterior to that date. There surely was no dissolution then, as the defendant admits that they carried the mail together until the 16th of May, 1870, four months and a half after that time.

It is insisted by defendant's counsel that upon the authority of *Wilkinson* v. *Jett*, 7 Leigh 115, the agreement between the parties did not amount to a partnership. The cases are entirely dissimilar. In that case Wilkinson was the sole contractor for carrying the mail and employed Jett to carry the mail half the time, and promised to pay him for so doing, one-half of what he received from the department, when he received it. There was nothing to show that there was any partnership between them, no agreement to share profits and suffer loses together. It was a mere employment. Here the parties each put in one-half the money to buy the contract, and were to share profits and suffer losses equally.

Was the partnership for a fixed or for an indefinite period?

Judge Story, in his work on Partnership sec. 277 says, "the question sometimes occurs whether a partnership under all the circumstances of the case, is properly to be treated as a partnership at will, or a a partnership for a limited period. It is by no means necessary that there should be an express stipulation either way; for its intended duration may often be ascertained by implications or presumptions arising from the acts and conduct of the parties and other accompanying circumstances. In the absence however of

all acts or circumstances, which clearly rebut and control the inference, the conclusion of law is that the partnership is intended to be at the mere will and pleasure of the parties. But acts and circumstances may greatly qualify or even overturn this conclusion."

From the acts and conduct of the parties and other accompanying circumstances, it is clear to my mind that the parties in this case intended the partnership to continue, until the Francis contract expired, and no longer. Then the subject of the partnership was gone and there was no longer anything upon which it could operate. The contract was bought by Moxley and paid for by Moxley and Cole, and owned jointly by them, and when that expired on the 1st of July, 1871, their partnership based thereon ceased.

Syllabus 2

When was it dissolved ?

A partnership may expire by its own express or implied limitation, whenever the event has occurred, which the parties naturally, or necessarily contemplated as its just termination. This may arise in two ways : 1. By the extinction of the thing which constituted the sole subject of the partnership. 2. By the completion or accomplishment of the entire business for which the partnership was formed. The partnership in this case continued .until the contract, which was the sole subject thereof, expired on the 1st of July, 1871, unless it was in some other way dissolved before that time.

It is claimed, by the counsel for defendant, that it was a partnership at will, which could at the pleasure of either of the parties be dissolved, and that Moxley did dissolve it on the 16th day of May, 1870.

Syllabus 3

We have seen that it was a partnership for a fixed period. Was it then in the power of Moxley to dissolve it in the manner he claims he did?

A partnership for a limited period, cannot be dissolved at the mere pleasure of one of the partners, but may be dissolved for reasonable cause. *McMahon et al. v. McClernan*, 10 W. Va. 419.

Judge Story, section 275. (Story on Part.), says : "Whenever a stipulation is positively made, that the partnership shall endure for a fixed period, or for a particular adventure or voyage, it would seem to be at once inequitable' and injurious to permit any partner at his mere pleasure, to violate his engagement, and thereby to jeopard, if not sacrifice the whole effects of the partnership; for the success of the whole undertaking may depend upon the due accomplishment of the adventure or voyage, or the entire time be required to put the partnership into beneficial operation. It is no answer to say that such a violation of the engagement, may entitle the injured party to a compensation in damages; for independently of the delay, and uncertainty attendant upon any such mode of redress, it is obvious that the remedy may be, nay, must be, in many cases, utterly inadequate and unsatisfactory. If there be any real and just ground for the abandonment of the partnership, a court of equity is competent to administer suitable redress. But this is exceedingly different from the right of the partner *sua sponte* from mere caprice, or at his own pleasure to dissolve the partnership." This reasoning, we think, is sound. It was also held, by the court, in *McMahon* v. *McClernan, supra,* that " when a dissolution of a partnership has taken place, an account will not only be decreed, but if necessary, a manager or receiver will be appointed to close the partnership business, and make sale of the partnership property, that a final distribution may be made of the partnership effects."

Here the partner claimed the right at his own pleasure, without any just ground to dissolve the partnership, seize the whole of the subject of the partnership, and appropriate it to his own use. This he could not do; and it is clear that by no action of his was the partnership dissolved, but that it continued to the 1st day of July, 1871, when it expired by limitation.

For the foregoing reasons, the decree of the circuit court of Lewis county, rendered in this cause on the

26th day of July, 1875, is reversed, with costs to the appellant, and this Court proceeding to render such decree as the circuit court should have rendered, the plaintiff's exception to the commissioner's report is sustained, and the statement of said commissioner based on the theory that the partnership was dissolved on the 1st day of July, 1871, is approved and confirmed, and the plaintiff must recover of the defendant, the sum of $133.11, the amount found due by the commissioner, with interest thereon, from the 30th day of January, 1874, together with his costs about his suit expended.

JUDGES GREEN and MOORE concurred.

DECREE REVERSED.